**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| ORUS ASHBY BERKLEY, | ) | |
| | ) | |
| JAMES T. AND KATHY E. CHANDLER, | ) | |
| | ) | |
| CONSTANTINE THEODORE AND PATTI LEE CHLEPAS, | ) | |
| | ) | |
| MARTIN AND DAWN E. CISEK, | ) | |
| | ) | |
| ROGER D. AND REBECCA H. CRABTREE, | ) | |
| | ) | |
| ESTIAL E. ECHOLS, JR. AND EDITH FERN ECHOLS, | ) | |
| | ) | |
| GEORGE LEE JONES, | ) | |
| | ) | |
| ROBERT WAYNE AND PATRICIA ANN MORGAN, | ) | |
| | ) | |
| MARGARET MCGRAW SLAYTON LIVING TRUST, | ) | Case No. 7:17-CV-00357 |
| | ) | _____ |
| and | ) | |
| | ) | |
| THOMAS AND BONNIE B. TRIPLETT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOUNTAIN VALLEY PIPELINE, LLC | ) | |
| **Serve:** | ) | |
| (Registered Agent) | ) | |
| CT Corporation System | ) | |
| 4701 Cox Road, Suite 285 | ) | |
| Glen Allen, VA 23060, | ) | |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION | ) | |
| **Serve:** | ) | |
| 888 First Street, N.E. | ) | |
| Washington, D.C. 20426 | ) | |
| | ) | |

20861/1/8091462v1

and )
                                                  )

CHERYL A. LAFLEUR, )
in her official capacity as Acting Chairman of the )
Federal Energy Regulatory Commission, )
**Serve:** )
888 First Street, N.E. )
Washington, D.C. 20426 )
                                           )
                      Defendants. )

## VERIFIED COMPLAINT

The Plaintiffs, by counsel, state their Complaint against Defendants, the Federal Energy Regulatory Commission and Acting Chairman Cheryl A. LaFleur in her official capacity (collectively "FERC" or the "Commission"), and Mountain Valley Pipeline, LLC ("MVP") as follows:

## PRELIMINARY STATEMENT OF THE CASE

1. The case before the Court, in its simplest form, is a constitutional challenge to the eminent domain provisions of the Natural Gas Act, 15 U.S.C. § 717f(h), and the resulting unconstitutional acts of FERC and ultimately MVP. In 1947, Congress delegated the power of eminent domain to FERC (at that time, the agency was known as the Federal Power Commission) to condemn properties for the construction and operation of interstate gas pipelines. Congress, however, failed to set forth any set standard, known as an intelligible principle, rendering its delegation of power overly broad and unconstitutional. Without boundaries from Congress, FERC has run wild in the years since, and has unconstitutionally sub-delegated the power of eminent domain to private parties seeking private profits. MVP is one such company seeking FERC's permission to proceed. Worse yet, FERC has published its Statement of Policy regarding its decision-making process for granting the power of eminent

2

20861/17/8091462v1

domain, and each of the tests falls well short of the Constitution and the Supreme Court's interpretation of the Takings Clause in *Kelo v. City of New London*, 545 U.S. 469 (2005).

2.      The Plaintiffs in this case are all landowners within the path of MVP's proposed 42-inch high pressure natural gas pipeline, from Summers County, West Virginia to Franklin County, Virginia.   These Plaintiffs seek declaratory and injunctive relief to protect their constitutional rights to secure their private property from a government-sanctioned land grab for private pecuniary gain.

## THE PARTIES

3.      Orus Ashby Berkley is a resident of Summers County, West Virginia and owns land near Pence Springs, West Virginia and along the Greenbrier River (Summers County Tax ID Nos. 7-15A-13.1, 7-15A-13).  Mr. Berkley has invested heavily in his riverfront property and maintains two rental cottages, a commercial sewer system, and a large parking lot.  Mr. Berkley has been delayed in completing site development for 50 riverside campsites for over three years due to MVP's plans to utilize his property as an access area to cross the Greenbrier River.

4.      James T. and Kathy E. Chandler maintain their family home on Bent Mountain in Roanoke County, Virginia (Roanoke County Tax ID Nos. 111.00-01-62.01-0000, 111.00-01-62.02-0000, and 117.00-01-38.00-0000).  MVP's proposed route bisects the Chandlers' property and MVP plans to use the only means of ingress and egress to the property as a permanent access road.  James T. Chandler is a trauma orthopedic surgeon called to the operating room at a moment's notice, rendering a permanent access road particularly problematic.

5.      Constantine Theodore and Patti Lee Chlepas are residents of Monroe County, West Virginia and maintain their permanent residence on a 21-acre tract near Lindside, West Virginia (Monroe County Tax ID No. 03-12-4).  The Chlepas operate Birdsong Farm, LLC, an

20861/1/8091462v1

organic apiary and bee preserve from the property. Birdsong Farm sells natural raw honey, 100% beeswax candles, all-natural insect repellants, essential oils, soaps, lip balm, and other natural products of the hive. MVP's plans entail construction of an access road as well as part of the main pipeline across the Chlepas' property.

6.       Martin and Dawn E. Cisek reside along the border of Giles County and Craig County, Virginia in the historic town of Newport (Giles County Tax ID Nos. 47-12A, 47-12B; Craig County Tax ID No. 120-A-9). MVP's proposed line will traverse across the middle of the Ciseks' property and within less than 150 feet of their home.

7.       Roger D. and Rebecca H. Crabtree reside in Monroe County, West Virginia near the town of Lindside. The Crabtrees own two parcels of land totalling approximately 30 acres (Monroe County Tax ID Nos. 3-30-18.8, 3-30-38.1). MVP plans to construct its pipeline on the Crabtrees' agricultural parcel, which contains a 20'x24' metal barn, a well, and a livestock watering system comprised of over 1,000' of piping. The Crabtrees raise sheep, chicken, and rams, and harvest hazelnuts, apples, walnuts, chestnuts and peaches. The Crabtrees' residence is located on the second parcel immediately adjacent to the agricultural parcel and is within the blast zone of the pipeline.

8.       Estial E. Echols, Jr., a U.S. Army veteran, and Edith Fern Echols are residents of Giles County, Virginia and have maintained their family home in the town of Newport, Virginia (Giles County Tax ID Nos. 46-20A, 46-19B) for 48 years. The center of MVP's proposed line traverses the Echols' property some 62 feet from their kitchen window.

9.       George Lee Jones, a U.S. Navy veteran, was born in 1930 on his family farm in Giles County, Virginia (Giles County Tax ID Nos. 47-1, 47-2). The family farm, now maintained by the seventh generation of Jones', will be bisected by the MVP pipeline.

10. Robert Wayne and Patricia Ann Morgan reside in Franklin County, Virginia near the town of Rocky Mount (Franklin County Tax ID No. 0440018700). MVP's proposed pipeline will bisect their tract of property and will be within several hundred feet of the Morgans' residence.

11. The Margaret McGraw Slayton Living Trust owns the residence of Michael E. and Margaret M. Slayton in Montgomery County, Virginia in the Mount Tabor area (Montgomery County Tax ID No. 017-A2D). The Slayton's residence is located along a ridge in the middle of a 90-acre tract of land which will be traversed by MVP's proposed pipeline near the family home.

12. Thomas and Bonnie B. Triplett own five contiguous parcels of land and maintain their residence in Montgomery County, Virginia, less than 1500 feet from the center of the proposed line. MVP's proposed route will divide a 33-acre tract of pristine, old growth forest in half (Montgomery County Tax ID No. 017-A2C). The Tripletts' affected tract contains an old cabin and serves as a family retreat and bountiful hunting grounds.

13. MVP is a Delaware limited liability company with its principal office located at 625 Liberty Avenue, Suite 1700 in Pittsburg, Pennsylvania 15222 and its registered agent listed as CT Corporation System, 4701 Cox Road, Suite 285 in Glen Allen, Virginia 23060. MVP conducts business in Virginia and West Virginia, including in the Western District of Virginia, Roanoke Division.

14. FERC is an independent federal agency charged with issuing Certificates of Convenience and Public Necessity pursuant to the Natural Gas Act for jurisdictional natural gas pipeline projects. The Commission is headquartered at 888 First Street, N.E., Washington, D.C. 20426.

15.     Cheryl LaFleur is the Acting Chairman of FERC, located at FERC's headquarters in Washington, D.C.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action asserts several federal questions of constitutionality.

17.     This Court possesses supplemental jurisdiction over the Virginia Plaintiffs' state constitutional challenge pursuant to 28 U.S.C. § 1367.

18.     This Court has personal jurisdiction over MVP and FERC because, *inter alia*, MVP and FERC conduct business in the Commonwealth of Virginia, including, *inter alia*, engaging in activities related to planning and constructing an interstate natural gas pipeline, and entering into agreements for the sale and purchase of property and property rights located in the Commonwealth of Virginia as well as the regulation of pipeline approval, construction, and operations.

19.     The properties at issue include properties located within this District.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts and transactions complained of herein occurred in this District, pursuant to 28 U.S.C. § 1391(b)(3) because MVP is subject to personal jurisdiction at the time this action is commenced, and pursuant to 28 U.S.C. § 1391(e)(1) because FERC is an agency of the United States.

## I.     Introduction

21.     In the summer of 2014, EQT Corporation ("EQT") and a subsidiary of NextEra Energy, Inc. ("NextEra"), proclaimed their intent to build a 42-inch high pressure natural gas pipeline from Wetzel County, West Virginia to Transcontinental Gas Pipeline Company's ("Transco") Zone 5 compressor station 164 in Pittsylvania County, Virginia.  Stretching more

than 300 miles through the steep slopes of the Appalachian mountains, across the George Washington National Forest and the Appalachian Trail, through countless watersheds serving the residents of West Virginia and Virginia, EQT and NextEra aptly named the project the Mountain Valley Pipeline ("MVP"). MVP's stated intent in constructing the pipeline is to connect the Marcellus and Utica shale fields to existing pipeline networks for shipment of cheap, fracked gas to the southeastern United States.

22. Late in the summer of 2014, Dominion Energy ("Dominion") teamed with Duke Energy ("Duke"), among others, and announced its intention to construct a 550-mile 42-inch high pressure natural gas pipeline to connect the same Marcellus and Utica formations from Harrison County, West Virginia to Chesapeake, Virginia and Robeson County, North Carolina. Dominion and Duke called the project the Atlantic Coast Pipeline ("ACP") and proclaimed it would serve markets in the southeastern United States, a reference to Dominion's initial name for the project – the Southeast Reliability Project.

23. As is evinced by the rush to build by ACP and MVP, there is no doubt that former Chairman of FERC Norman Bay was correct in stating, "[t]he shale revolution has upended U.S. energy markets" and global energy markets.[1] Despite these massive changes in the past decade, no federal agency, including the Commission, has ever "conducted a comprehensive study of the environmental consequences of increased production from th[e Marcellus and Utica shale] region."[2] Likewise, in evaluating whether expanding infrastructure warrants certification, FERC has "largely relied on the intent to which potential shippers have signed precedent agreements for capacity on the proposed pipeline" to show market need rather than engage in a comprehensive

---

[1] *See* Norman Bay's Separate Statement in Order Granting Abandonment and Issuing Certificates, FERC Docket Nos. CP15-115-000, CP15-115-001 (February 3, 2017).
[2] *Id.*

7

evaluation of need.[3]  Isolated evaluation of applications for new natural gas infrastructure projects within the boom-bust world of the energy industry has led to stranded assets, such as the abandonment of several gas import terminals built in the early 2000s.

24.    But the boom in infrastructure projects does not excuse FERC from its fundamental constitutional obligations to exercise power lawfully and in accordance with its jurisdictional mandate.  Rather than exercise its delegated powers in accordance with Congress' instructions and well-established intelligible principles, FERC has morphed into judge, jury, and (almost never) executioner for the plethora of natural gas infrastructure expansion by private companies for private gain.  Worse yet, not only does FERC exercise authority outside of its delegated powers, FERC has replaced our Founders' guidance in the Fifth Amendment Takings Clause with its own economic sliding scale/balancing test that, at best, weighs perceived public benefits against adverse effects when determining whether to grant a private corporation the uniquely governmental power of eminent domain.

25.    When challenged through the administrative process, FERC inevitably tolls all challenges to the Commission's actions under the Administrative Procedures Act, permitting construction to proceed at a blistering pace, thus rendering any challenges moot.  FERC's actions embody the spirit of seeking forgiveness rather than permission, while landowners and other interested citizens are demoted to subservient permission seekers, bearing no resemblance to the principle of the "consent of the governed" upon which this Nation's laws were derived.

26.    FERC should no longer be permitted to exceed its unlawfully delegated authority or to apply an unconstitutional standard in determining when a private corporation should be permitted to take private property for private gain under auspices of the Natural Gas Act, 15

---

[3] *Id.*

U.S.C. § 717, *et seq*. The Commission's interpretation and application of the Natural Gas Act's eminent domain provisions, 15 U.S.C. § 717f(h), are facially unconstitutional and unconstitutional as applied to the MVP project. This Court is the only check on FERC's exercise of near absolute power; accordingly, FERC must be enjoined from issuing a Certificate to MVP and to any other private natural gas company under the Commission's fundamentally flawed policy for assessing public use/purpose in contravention of the Fifth Amendment.

## II.    Factual Background

### A.    The Natural Gas Act

27.    The year 1938 marked the 75th anniversary of the Battle of Gettysburg, the first appearance of Superman in Action Comics #1, the terror-inducing first radio broadcast of Orson Welles's *The War of the Worlds*, and Seabiscuit's famous victory over War Admiral at Pimlico. In Europe, Winston Churchill prodded Neville Chamberlain to challenge Adolf Hitler and the rise of Nazism in Germany, while in the United States, the Supreme Court issued its landmark decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938) and, with much less fanfare, Congress passed the Natural Gas Act, 15 U.S.C. § 717, *et seq*. Congress determined for the first time that "the business of transporting and selling natural gas in interstate commerce *for ultimate distribution to the public* is affected with a public interest." 52 Stat. 821, § 1(a) (1938) (emphasis added). Congress proclaimed that the Natural Gas Act "shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for *ultimate public consumption* for domestic, commercial, industrial, or any other use…." *Id.* at § 1(b) (emphasis added).

28.     The 1938 Natural Gas Act provided the Federal Power Commission[4] with authority to order a natural gas company to expand its facilities, after notice and an opportunity for a hearing, where the Commission "finds such action necessary or desirable *in the public interest*." *Id.* at 824, § 7(a) (emphasis added). Section 7(c) addressed the topic of independent, private expansion by a natural gas company, mandating that a company obtain a "certificate that the present or future public convenience and necessity require or will require such new construction or operation…." *Id.* at 825, § 7(c). Congress clarified that "it being the intention of Congress that natural gas shall be sold in interstate commerce for resale for *ultimate public consumption* for domestic, commercial, industrial, or any other use at the lowest possible reasonable rate consistent with the maintenance of adequate service in the public interest." *Id.* (emphasis added). Notably, Congress did not delegate the power of eminent domain to a private natural gas company in 1938 and the issuance of a Certificate did not result in any automatic conferral of governmental power to a natural gas company.

29.     Nine years later, Congress amended section 7 of the Natural Gas Act providing that "[w]hen any holder of a certificate of public convenience and necessity cannot acquire by contract, or is unable to agree with the owner of property to the compensation to be paid for, the necessary right-of-way to construct, operate, and maintain a pipe line or pipe lines for the transportation of natural gas … it may acquire the same by exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts." 52 Stat. 824 (1947). Since 1947, private companies have exercised the power of eminent domain upon obtaining a certificate of public convenience and necessity.

---

[4] The Federal Power Commission was the predecessor to the Federal Energy Regulatory Commission.

20861/1/7809146201

30.     Following the oil crisis of 1973, President Carter signed into law the Department of Energy Organization Act of 1977, which consolidated a variety of energy-related agencies under the newly formed Department of Energy.  One such independent agency, the Federal Power Commission, was part of this consolidation.  *See* 91 Stat. 565 (1977).  As part of the creation of the Department of Energy, Congress dissolved the Federal Power Commission, created FERC, and transferred the powers under the Natural Gas Act conferred to the Federal Power Commission to FERC.  *Id*; *see also* 42 U.S.C. § 7172(a).

31.     Accordingly, when FERC issues a Certificate to a natural gas company, so too does FERC "confer[] on the developer eminent domain authority (15 U.S.C. § 717f(h))."[5]  By operation of section 717f(h) in the form of a Certificate granted by FERC, a private natural gas company obtains "the authority to secure property rights to lay the pipeline if the developer cannot secure the necessary rights-of-way from landowners through negotiation."[6]  FERC, then, is the governmental agency responsible for conferring the power of eminent domain to a private gas company under the Natural Gas Act, an act which is itself independently unconstitutional.

**B.     A Boom in Domestic Natural Gas Production Has Led to Overbuilding of Pipeline Infrastructure and a Domestic Gas Glut**

32.     In more recent times, the domestic production of natural gas has expanded dramatically, and led to unprecedented infrastructure growth, particularly between 1998 and 2013.[7]  Growth in production stems largely from the exploitation of the Marcellus and Utica shale fields across the Appalachian Basin and the Haynesville field near the Gulf Coast.[8]  As a result of this expanded production in the shale fields, energy companies have continued to seek

---

[5] Paul W. Parfomak, *Interstate Natural Gas Pipelines: Process and Timing of FERC Permit Application Review*, Congressional Research Service, January 16, 2015, at p. 5.
[6] *Id.* at p. 6.
[7] *Natural Gas Infrastructure Implications of Increased Demand from Electric Power Sector*, U.S. Departmenet of Energy, Feb. 2015, p.9.
[8] *Id.* at p. 3.

20861/1/7809146 2v1

approval to construct and operate natural gas pipelines to get natural gas to market. Recent economic studies conclude, however, that "[t]he pipeline capacity being proposed exceeds the amount of natural gas likely to be produced from the Marcellus and Utica formations over the lifetime of the pipelines."[9] Likewise, economists have concluded that "the supply capacity of the Virginia-Carolina region's existing natural gas infrastructure is more than sufficient to meet expected future peak demand."[10]

33. Concurrent to the pipeline infrastructure boom has been a steep rise in natural gas exports from the United States to the rest of the world. In the U.S. Energy Information Administration's ("EIA") *Annual Energy Outlook 2017*, the United States is on pace to become a net exporter of natural gas on an average annual basis by 2018.[11] The EIA noted that pipeline imports of natural gas will continue to decline, while pipeline exports to Mexico and Canada steadily rise and liquid natural gas ("LNG") exports increase dramatically between 2017 and 2040:[12]

---

[9] Cathy Kunkel and Tom Sanzillo, *Risks Associated with Natural Gas Pipeline Expansion in Appalachia, Proposed Atlantic Coast and Mountain Valley Pipelines Need Greater Scrutiny, Institute for Energy Economics and Financial Analysis*, p. 11 (April 2016); see also *Are the Atlantic Coast Pipeline and the Mountain Valley Pipeline Necessary? An examination of the need for additional pipeline capacity into Virginia and Carolinas*, Synapse Energy Economics, Inc. (September 12, 2016).
[10] *Are the Atlantic Coast Pipeline and the Mountain Valley Pipeline Necessary? An examination of the need for additional pipeline capacity into Virginia and Carolinas*, Synapse Energy Economics, Inc., p. 1 (September 12, 2016).
[11] *See* U.S. Energy Information Administration, *Annual Energy Outlook 2017*, p. 66; *EIA: LNG exports expected to drive growth in U.S. natural gas trade*, World Oil, February 24, 2017.
[12] Annual Energy Outlook 2017, at p. 66.

20861/1/7809T462v1



By 2020, at least five LNG export terminals will be in operation and capable of exporting 9.2 billion cubic feet of gas per day. By 2040, LNG exports are expected to grow to 23 billion cubic feet of gas per day.[13] LNG export terminals that have already been approved and are currently under construction include Dominion Energy's Cove Point LNG facility in Lusby, Maryland; Southern LNG Company's Elba Island, Georgia facility; and various other LNG facilities in Sabine and Hackberry, Louisiana; as well as Freeport and Corpus Christi, Texas:

**Export Terminals**

**U.S.**
**APPROVED - UNDER CONSTRUCTION - FERC**
5. Sabine, LA:  0.7 Bcfd (Cheniere/Sabine Pass LNG) (CP11-72 & CP14-12)
6. Hackberry, LA:  2.1 Bcfd (Sempra–Cameron LNG) (CP13-25)
7. Freeport, TX:  2.14 Bcfd (Freeport LNG Dev/Freeport LNG Expansion/FLNG Liquefaction) (CP12-509) (CP15-518)
8. Cove Point, MD:  0.82 Bcfd (Dominion–Cove Point LNG) (CP13-113)
9. Corpus Christi, TX:  2.14 Bcfd (Cheniere – Corpus Christi LNG) (CP12-507)
10. Sabine Pass, LA:  1.40 Bcfd (Sabine Pass Liquefaction) (CP13-552) ★
11. Elba Island, GA:  0.35 Bcfd (Southern LNG Company) (CP14-103)

**APPROVED – NOT UNDER CONSTRUCTION - FERC**
12. Lake Charles, LA:  2.2 Bcfd (Southern Union – Lake Charles LNG) (CP14-120)
13. Lake Charles, LA:  1.08 Bcfd (Magnolia LNG) (CP14-347)
14. Hackberry, LA:  1.41 Bcfd (Sempra - Cameron LNG) (CP15-560)
15. Sabine Pass, TX:  2.1 Bcfd (ExxonMobil – Golden Pass) (CP14-517)

---

[13] *Id.*

208611/7809T462v1



Three of these LNG facilities, Cove Point, Elba Island, and Sabine Pass, are directly connected to the 10,500-mile Transco line, which traverses from the Gulf Coast to the New York City area and which MVP seeks to connect with in Pittsylvania County at the Zone 5 Hub at Station 165:



14

### C.     The Role of the Federal Energy Regulatory Commission

34.     The application and approval process for interstate pipelines is regulated by FERC.  In order to construct, and then to operate, a natural gas pipeline, a natural gas company must file an application with FERC seeking a Certificate of Public Convenience and Necessity ("Certificate").  If a natural gas company is granted a Certificate, it is granted the power of eminent domain pursuant to the Natural Gas Act, 15 U.S.C. § 717f(h).

35.     As part of any application for a Certificate, a natural gas company is expected to provide information to FERC, such as a "concise description of the proposed service, sale, operation, construction, extension, or acquisition [that] is or will be required by the present or future public convenience and necessity."  18 C.F.R. § 157.6(b)(2).  18 CFR § 157.14(12) requires a natural gas company to provide certain market data in Exhibit I to its application.  In particular, the regulations require a natural gas company to provide "[a] system-wide estimate of the volumes of gas to be delivered during each of the first 3 full years of operation of the proposed service, sale, or facilities and during the years when the proposed facilities are under construction, and actual data of like import for each of the 3 years next preceding the filing of the application."  18 C.F.R. § 157.14(12).  Exhibit I should also provide "[n]ames and locations of customer companies and municipalities, showing the number of residential, commercial, firm industrial, interruptible industrial, residential space-heating, commercial space-heating, and other types of customers… [as well as] an explanation of the end use to which each of these industrial customers will put the gas."  18 C.F.R. § 157.14(12)(i).  A natural gas company's application must also "contain copies of any contracts, purchase agreements, or other documentation reflecting the sale or transport of natural gas as part of the application."  18 C.F.R. § 157.14(12)(v).

20861711809T462v1

36. Despite this plethora of regulations setting forth the application process and documentation required by FERC, changes in the natural gas industry due to the shale boom caused FERC to examine its certification policies in 1999 and 2000. FERC analyzed various issues affecting the gas industry, including whether the Commission should independently evaluate markets to determine true need and whether to more closely scrutinize supply agreements between affiliates of the applicant.

37. The Commission issued a Statement of Policy on September 15, 1999 regarding its new approach to certification and pricing of new construction projects. *See* 88 FERC ¶ 61, 227, attached hereto as **Exhibit 1**. Prior to issuing the Statement of Policy, FERC held a public conference and considered comments from interested parties, namely from the natural gas industry. *Id.* After conducting the public conference and considering comments, FERC decided that it needed to review "the Commission's policy for determining whether there is a need for a specific project and whether, on balance, the project will serve the public interest." *Id.* at 2.

38. In considering how to present its policy to stakeholders, FERC solicited responses from commenters on key questions, including: "(1) Should the Commission look behind precedent agreement or contracts presented as evidence of market demand to assess independently the market's need for additional gas service?, and (2) Should the Commission apply a different standard to precedent agreements or contracts with affiliates than with non-affiliates?" *Id.* at 3.

39. In summarizing the weaknesses in FERC's historical policy, the Commission noted that it previously relied too heavily on the existence of precedent contracts to evince a need in the market, which FERC equates to evincing a public need. Specifically, FERC noted that "[t]he amount of capacity under contract also is not a sufficient indicator by itself of the need for

a project…[and u]sing contracts as the primary indicator of market support for the proposed pipeline project also raises additional issues when the contracts are held by pipeline affiliates." *Id.* at 16. Put another way, FERC recognized that market need as expressed with affiliate/subsidiary precedent contracts may not really establish a market need, but instead establish that a pipeline project seeks approval to ship its indirectly-owned gas.

40. In response, FERC outlined a new analysis focused on balancing "the public benefits against the potential adverse consequences" of a new pipeline project. *Id.* at 18. In determining whether to grant a Certificate, FERC considers "all relevant factors reflecting on the need for the project … [including] precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of capacity currently serving the market." *Id.* If the supposed public benefits outweigh the adverse effects, FERC grants a Certificate.

41. In its Statement of Policy, FERC listed several typical indicators of public benefit, such as eliminating bottlenecks, providing access to new suppliers, and providing competitive alternatives. FERC was clear that while "[v]ague assertions of public benefit will not be sufficient," an applicant need not conduct a market study for each project, but "could rely on generally available studies by EIA or GRI…." *Id.* at 25. FERC described its view of eminent domain as requiring a "sliding scale approach" where "the strength of the benefit showing will need to be proportional to the applicant's proposed exercise of eminent domain." *Id.* at 27. Put simply, FERC's decision-making process employs a proportional/sliding scale/balancing test to weigh potential public benefits against the potential adverse effects (e.g., environmental harms, economic harm, landowner interests, etc.).

20861711/809146201

### D. MVP's Application and Its Self-Created Need

42. MVP filed its Application for a Certificate with FERC on October 23, 2015, seeking authorization to construct, own, and operate a 301-mile interstate pipeline through West Virginia and Virginia, as well as three compressor stations and other required facilities. MVP seeks authorization to construct a 42-inch pipeline to provide up to 2.0 million dekatherms per day ("MMDth/d") "of firm transportation service, which has been fully subscribed, to satisfy the growing demand for natural gas by local distribution companies ("LDCs"), industrial users, and power generation facilities in the Mid-Atlantic and southeastern markets, as well as markets in the Appalachian region, using natural gas produced in the Appalachian Basin shale region."[14] MVP's proposed route is as follows:

---

[14] Certificate Application at 2, available at
https://www.mountainvalleypipeline.info/~/media/sites/mvp/files/Certificate-Application-VOL-I.pdf (last accessed July 26, 2017).



43.     MVP anticipates four interconnection facilities including one interconnection with Equitrans' exhibiting H-302 pipeline near the MarkWest Mobely Processing facility in Wetzel County, West Virginia; one interconnection in Harrison County, West Virginia near another processing facility; one interconnection in Braxton County, West Virginia at Columbia's WB System; and one interconnection with Transco near station 165 in Pittsylvania, Virginia. Certificate Application, at 8.  MVP claimed that "at least one tap will be installed to serve Roanoke Gas Company, LLC, an LDC in southwestern Virginia."  *Id.* at 9.

19

44.     MVP declared in its application that the primary purpose of constructing the pipeline will be to connect shale natural gas supplies from northern West Virginia to Transco Station 165, which is the "existing pooling point for Zone 5 on Transco's system and a gas trading hub for the Mid-Atlantic market." *Id.* at 10.  In court proceedings in West Virginia, MVP admitted that "[t]he primary purpose of [MVP's pipeline] is to deliver gas to the Transco pool." *Mt. Valley Pipeline, LLC v. McCurdy*, 793 S.E.2d 850, 861 (W.Va. 2016).

45.     MVP's main evidence of market demand stems from four precedent agreements for 2.0 MMDth/d resulting in the project being fully subscribed prior to approval.  *Id.*  MVP also cited U.S. Census Bureau population growth estimates, the demands of the Clean Power Plan, as well as the Energy Information Administration's 2015 Annual Energy Outlook as a basis for market need.

46.     MVP noted that as a result of the shale boom, "natural gas produced in the Appalachian Basin has greatly outpaced regional market demand" resulting in "reduced gas prices in the Appalachian region to historic lows" and has triggered the emergence of new pipelines to "access this prolific supply and transport it to market." *Id.* at 14-15.  MVP claimed in its application that its new 301-mile pipeline "will serve the growing natural gas needs of the Mid-Atlantic and southeastern markets as well as markets along the pipeline route and will enhance the reliability and flexibility of the interstate pipeline grid in these regions." *Id.* at 15.

47.     To illustrate need, MVP attached four precedent agreements accounting for a full subscription to ship 2.0 MMDth/d on the pipeline.  *See* Exhibit I to MVP's Application, Market Data.  MVP extolled that the line was fully subscribed by EQT Energy, LLC; Roanoke Gas; USG Properties Marcellus Holdings, LLC; and WGL Midstream, Inc.  *Id.* at 16.  Absent from MVP's application, however, is any mention that the pipeline is fully subscribed solely by

20

affiliates of MVP. EQT Energy, LLC subscribed to 1,290,000 Dth/d, representing 64.5% of the capacity of the pipeline. EQT Energy, LLC operates as a subsidiary of EQT Midstream Partners, LP, and EQT Midstream Partners, LP owns the largest stake in MVP, 45.5%.

48. Similarly, MVP exhibited a precedent agreement with USG Properties Marcellus Holdings, LLC for 500,000 Dth/d, accounting for 25% of the subscription capacity on the line. USG Properties Marcellus Holdings, LLC, is an affiliate of US Marcellus Gas Infrastructure, LLC, the direct owner of 31% of MVP, and a subsidiary of NextEra US Gas Assets, LLC. NextEra US Gas Assets, LLC is an indirect, wholly-owned subsidiary of NextEra Energy Inc.

49. MVP produced an executed precedent agreement for 200,000 Dth/d with WGL Midstream, Inc. accounting for 10% of the subscription capacity. WGL Midstream, Inc. currently owns 10% of MVP.

50. MVP's final precedent agreement was executed with Roanoke Gas Company for 10,000 Dth/d, or 0.5% of the subscription capacity of the pipeline. RGC Midstream, LLC is a subsidiary of RGC Resources, Inc. RGC Resources, Inc. is the holding company for Roanoke Gas Company. RGC Midstream, LLC owns 1% of MVP and joined the MVP joint venture 13 months after MVP was originally incorporated, and just weeks prior to MVP's application for a Certificate.

51. While MVP claimed that its capacity is fully subscribed, 100% of the subscription capacity derives from entities that own the pipeline and the precedent agreements are not binding until after issuance of a Certificate.

52. MVP also conducted several binding open season offers between 2014 and 2015 as well as a non-binding interim period open season to "provide all market participants the opportunity to identify short-term transmission capacity needs at diverse receipt locations in the

21

20861?1/7809?462v1

Appalachian Basin to the new WB Interconnect in Braxton County, West Virginia." Application at 16-17. MVP claimed to have received interest in the non-binding interim open season, but no agreements have been produced to date.

53. Whether MVP obtained interest in its binding open seasons is unknown. However, MVP claimed it has been fully subscribed only by its affiliates. Prior to these affiliate subscriptions, MVP's first open season was announced on June 12, 2014 on joint EQT and NextEra Energy letterhead, and was slated to be closed July 10, 2014. This first open season sought subscriptions for the entirety of the pipeline and noted that the "primary point of delivery will be Transco Zone 5 Station 165 in Pittsylvania County, Virginia." Exhibit Z-4 to Application. MVP described Transco Zone 5 Station 165 as a "highly liquid trading area" that "merges with the mainline at Station 165 as well as [provides] deliveries to Cove Point LNG." *Id.*

54. MVP's second open season was again advertised on joint EQT and NextEra Energy letterhead as a binding open season between September 9, 2014 and September 29, 2014 for the full length of the proposed line. MVP advertised access to the liquefaction plant at Cove Point, Maryland. On the final date of the binding open season, MVP announced that it would extend the subscription offers to October 6, 2014. MVP extended the open season three more times, to October 10, 2014, October 14, 2014, and October 21, 2014. It is unknown whether any non-affiliates responded to any of MVP's open seasons and MVP's Certificate Application does not mention any binding open seasons for capacity on the entirety of the line, and instead only refers to the interim non-binding open season offered in September 2015.

55. MVP's first executed precedent agreement was entered on March 10, 2015 with 10% owner WGL Midstream. MVP's precedent agreements with Roanoke Gas Company (i.e.,

RGC Midstream, 1% stake), USG Properties Marcellus Holdings, LCC (i.e., NextEra Energy, 31% stake), and EQT Energy, LLC (*i.e.*, EQT Midstream, 45.5% stake), were executed just days prior to MVP's filing of its Certificate Application.

56.    On January 22, 2016, MVP announced that Consolidated Edison, Inc., through its subsidiary Con Edison Gas Midstream, acquired a 12.5% ownership in MVP, and at the same time a sister subsidiary, Consolidated Edison Company of New York, Inc., entered into a precedent agreement subscribing to 250,000 Dth/d, while USG Properties Marcellus Holdings, LLC decreased its subscription by 250,000 Dth/d.[15]

57.    To date, MVP has not exhibited any non-affiliate subscription agreements or any other evidence of negotiations with non-affiliates.    Likewise, FERC's Draft and Final Environmental Impact Statement fails to acknowledge, much less highlight, the fact that 100% of the subscription commitments for use of MVP are by owner-affiliates of MVP.

E.    **FERC's Criteria for Analyzing Certification Falls Well Short of Constitutional Standards**

58.    As noted above, FERC issued a Statement of Policy on September 15, 1999, setting forth its policies on certification and natural gas pricing of new construction projects due to the rapid changes in the natural gas industry that occurred in the late 1990s.  *See* **Exhibit 1**. FERC noted that any effective certification policy should "further the goals and objectives of the Commission's natural gas regulatory policies" including "foster[ing] competitive markets, protect[ing] captive customers, and avoid[ing] unnecessary environmental and community impacts while serving increasing demands for natural gas." *Id.* at p. 13.  FERC's purpose was to introduce and apply "an analytical framework for deciding … when a proposed project is

---

[15]    *See*    http://www.roanoke.com/business/news/mountain-valley-secures-new-pipeline-partner-and-customer-in-con/article_419a2c13-3105-5960-b446-cf5b82dfc2cb.html;    DEIS  at  1-10, available  at  https://www.mountainvalleypipeline.info/~/media/Sites/MVP/Files/MVP%20EEP%20DEIS%20Sections%201-5.ashx?la=en (last accessed July 26, 2017).

20861/1/8091462v1

required by the public convenience and necessity" in a manner consistent with the Commission's regulatory policies. *Id.* Notably absent, however, is any reference to, or recognition of, the constitutional standards at play for determining whether the taking of private property, even with just compensation, is for a public use or purpose. Rather than analyze and apply a standard for assessing public purpose/use that comports with the Constitution, FERC devised a series of sliding scale tests that fail to pass constitutional muster.

59.     The Commission's primary, and threshold concern, focuses not on determining any need for the project or whether the project would be for a public purpose or use, but instead on what the market effects might be on captive customers of the natural gas company. *Id.* at 18. Consistent with FERC's stated policy goal of protecting captive customers, the Commission analyzes whether the proposed project will be subsidized by current customers of the company as well as what steps the company is willing to take to mitigate the potential adverse effects suffered by current customers, landowners, or the communities affected by the proposed project.

60.     In the Commission's own words, "if an applicant can show that the project is financially viable without subsidies, then it will have established the first indicator of public benefit." *Id.* at 22. Put another way, if the natural gas company can finance a project without pushing the cost of the project to the public (or a small subset of the public: the consumers of that company's services), there is presumed to be a public benefit.

61.     Assuming a proposed project meets the threshold requirements on financing, a public benefit will be presumed to exist and FERC moves on to "balance" factors to determine whether the public benefits outweigh adverse impacts. *Id.* at 22-23. An applicant should demonstrate public benefit to FERC by providing "precedent agreements, demand projections, potential cost savings to consumers, or a comparison of projected demand with the amount of

capacity currently serving the market." *Id.* at 23. The natural gas company's path to obtaining the federal power of eminent domain involves making a "sufficient showing of the public benefits of its proposed project to outweigh any residual adverse effects." *Id.*

62. In assessing adverse effects, FERC closely examines the interests of the applicant's existing customers, the interests of competition pipelines and their captive customers, as well as the interests of landowners and the surrounding communities. *Id.* The Commission's approach is almost singularly economic in nature, but FERC's Statement of Policy mentions, albeit in passing, that "there are other interests that may need to be separately considered in a certificate proceeding, such as environmental interests." *Id.* While recognizing that landowner and community interests can be distinct from environmental interests, the Commission states that "[t]raditionally, the interests of the landowners and the surrounding community have been considered synonymous with the environmental impacts of the project." *Id.* at 24.

63. FERC also sets forth a list of factors indicating a public benefit, and an applicant "must show public benefits that would be achieved by the project *that are proportional to* the project's adverse impacts." *Id.* at 25. Because the test promulgated by FERC is a proportional test, the Commission's policy is clear that the "amount of evidence necessary to establish the need for a proposed project will depend on the potential adverse effects of the proposed project on the relevant interests." *Id.* Under this approach, if FERC determines that it cannot articulate any adverse effects at all (whether economic, environmental, or otherwise), the Commission would grant a Certificate, as well as the power of eminent domain, upon a showing of no public benefit at all.

64. While the Commission states that "[v]ague assertions of public benefits will not be sufficient" to obtain a Certificate, the Commission nevertheless equates even a scintilla of

20861/1/8091462v1

evidence of market demand, even through affiliate-only precedent agreements, with public benefit. A private market need for a private natural gas company to ship its affiliate-owned fracked natural gas to market, domestic or otherwise, does not equate to a public benefit, much less a public purpose or public use. FERC views precedent agreements, even solely with affiliates, as "significant evidence of demand for the project." *Id.* To FERC, demand equates to public benefit.

65.     Indeed, the Commission explains that where a natural gas company can illustrate that it has acquired through negotiations a significant portion of easements to construct a project, "a few holdout landowners cannot veto a project, as feared by some commenters" because the natural gas company need only "present some evidence of market demand" to outweigh the holdout landowners' concerns. *Id.* at 27.

66.     Because FERC has promulgated a proportional balancing test premised upon a sliding scale of evidence for determining whether to confer a Certificate and the power of eminent domain, it does not apply "bright line standards or tests." *Id.* at 26. Instead, as FERC itself articulates, "[t]he objective is for the applicant to develop whatever record is necessary, and for the Commission to impose whatever conditions are necessary, for the Commission to be able to find that the benefits to the public from the project outweigh the adverse impact on the relevant interests." *Id*. Put another way, the Commission will sub-delegate the power of eminent domain to a private natural gas company so long as the private natural gas company gives FERC enough of a record to justify an approval.

F.     **MVP Has Already Engaged in Unlawful Takings in Virginia in Violation of the United States Constitution and the Virginia Constitution**

67.     The Virginia General Assembly enacted § 56-49.01 of the Virginia Code in 2004. Section 56-49.01 provides a conditional statutory right of entry to a natural gas company to

20861/1/8091462v1

"make such examinations, tests, hand auger borings, appraisals, and surveys for its proposed line or location of its works as are necessary …." Va. Code § 56-49.01(A). There are two initial, necessary threshold requirements that must be satisfied before the natural gas company may enter the property without the owner's permission: the examinations must be necessary "(i) to satisfy any regulatory requirements" and necessary "(ii) for the selection of the most advantageous location or route…." Va. Code § 56-49.01(A)(i)-(ii).

68. Once a natural gas company triggers the right of entry by showing necessity under § 56-49.01(A)(i)-(ii), the company must also satisfy three further conditions including: (a) it must request the landowner's permission in accordance with the strict procedures set forth in § 56-49.01(B); (b) it must show that the owner's permission is not received prior to the date proposed by the company; and (c) it must provide the landowner notice of its intent to enter pursuant to the procedures set out in § 56-49.01(C). Only when all of these conditions are satisfied by the natural gas company does the "right of entry" spring into existence and exempt the particular entry from common law civil and criminal trespass. Va. Code § 56-49.01(D).

69. Eight years after the enactment of § 56-49.01, on November 6, 2012, an amendment to § 11 of Article I (Bill of Rights) of the Virginia Constitution was ratified by an overwhelming majority of voters and took effect on January 1, 2013. The 2012 amendment added significant protection to the right of private property, including "[t]hat the General Assembly shall pass no law whereby private property, the right to which is fundamental, shall be damaged or taken except for public use." Va. Const., Art. I, § 11. The amendments provided that "a public service company, public service corporation, or railroad exercises the power of eminent domain for public use when such exercise is for the authorized provision of utility, common carrier, or railroad services" but in any other cases, "a taking or damaging of private

20861711809T462v1

property is not for public use if the primary use is for private gain, private benefit, private enterprise, increasing jobs, increasing tax revenue, or economic development ….." *Id.*

70. In this case, MVP has been engaged in surveying activities across Virginia under claimed right of entry pursuant to Virginia Code § 56-49.01. The invasive survey activities MVP performs, including *inter alia*, cultural, wetland, endangered species, centerline, water, and soil, cannot be deemed trivial or inconsequential. Like an invasive non-consensual blood draw or an unauthorized disclosure of private medical records, the information and data MVP collects about a landowner's property is not readily ascertainable or available from public records, and amounts to an unlawful private taking. The information and data surveyors gather from a landowner's land through surveying activities is a portable and marketable commodity. In the current age of information, data as well as metadata, are valuable commodities that can readily be sold to the highest commercial bidder, and any and all information obtained by MVP in connection with its surveying activities is not subject to any regulatory oversight.

71. The information gathered by MVP through its surveying activities holds tangible and intangible value that forms just one part of the bundle of rights possessed by a fee simple owner of real property. It has long been recognized that the fee simple holder of real property is the "owner of everything above and below the surface from the sky to the center of the earth, expressed in the maxim, *Cujus est solum, ejus est usque ad coelum et ad infernos* …." *Clinchfield Coal Corp. v. Compton*, 148 Va. 437, 451 (1927). Everything above and below the surface from the sky to the center of the earth necessarily includes the tangible and intangible property contained therein, including information about the contents and constituent parts of the land, water, flora, and fauna contained within the bounds of a tract of real property.

72.     The law also recognizes that the information and data obtained through surveying activities possesses commercial value that receives specific tax treatment under the Internal Revenue Code.  As explained by the Tax Court, the "benefit derived" from surveying like that conducted by MVP constitutes "information" and "scientific knowledge" that may qualify as a capital expenditure.  *See Louisiana Land & Exploration Co. v. Comm'r.*, 7 T.C. 507, 515 (1946) (treating the cost of a geophysical survey by a land developer as a capital expenditure rather than an ordinary business expense).  Section 197 of Title 26, United States Code, provides for an amortized deduction for any intangible property, including "business books and records, operating systems, or *any other information base*."  26 U.S.C. § 197(d)(1)(C)(ii).

73.     The law recognizes that intangible and tangible property possesses inherent value. In this case, the intangible and tangible property taken by MVP from Virginians has immense value, so much so that MVP will not share the property it has taken with landowners and treats the information as confidential and proprietary.  Specifically, MVP classifies Volume IV of its Application for a Certificate as "Privileged" and includes "[c]ultural resource and landowner information from Environmental Report and confidential, proprietary contractual information." *See* Cover Letter to MVP's Application for a Certificate of Public Convenience and Necessity, attached as **Exhibit 2.**  Indeed, FERC recognizes the value of the information and refuses to release information obtained by MVP and shared with FERC to the very landowners that are the only persons that should have exclusive rights of possession.

<u>**Count One: Violation of the Fifth Amendment**</u>
<u>**Rights of All Plaintiffs by FERC and MVP**</u>

74.     The Plaintiffs hereby incorporate the facts and allegations contained in paragraphs 1-73 above.

20861/1/8091462v1

75. The Fifth Amendment to the United States Constitution requires that private property may only be taken "for public use" and that "just compensation" must be paid. As outlined above, FERC does not evaluate proposed pipeline projects according to a constitutional standard and instead applies its own proportional, sliding scale economic balancing test to determine if it will approve a project and empower a private party with the power of eminent domain.

76. As applied by FERC generally and ultimately to MVP here, the power to exercise eminent domain as derived under the Natural Gas Act, 15 U.S.C. § 717f(h) is unconstitutional, because FERC's tests for granting the power of eminent domain via a Certificate fall well below the standard imposed by the Fifth Amendment.

77. As applied in this case, then, MVP's application and FERC's application of its tests as set forth in its Statement of Policy cannot pass constitutional muster. Accordingly, FERC should be precluded from granting MVP a Certificate.

### Count Two: Congress' Delegation to FERC of the Power of Eminent Domain under 15 U.S.C. § 717f(h) is Overly Broad and Unconstitutional

78. The Plaintiffs hereby incorporate the facts and allegations contained in paragraphs 1-77 above.

79. FERC cannot lawfully exercise the power of eminent domain delegated to it by Congress via the Natural Gas Act because Congress' delegation of the power under 15 U.S.C. § 717f(h) is overly broad.

80. Under the non-delegation doctrine, Congress must properly limit the exercise of any delegated power by setting forth an intelligible principle—a standard—for the regulatory body to follow in its case-by-case assessments. Congress failed to set forth any intelligible principle to FERC under the Natural Gas Act. In doing so, Congress delegated not only the

authority to *execute* the law to FERC but also the authority to determine what the law *shall be*, which is impermissible under the Constitution, regardless of whether the standard applied by FERC could even pass constitutional muster, which it does not here.

81.     Because Congress' delegation of the power of eminent domain to FERC is overly broad, FERC cannot lawfully exercise the power of eminent domain and cannot confer the power to MVP or any other natural gas company.

<u>**Count Three: FERC's Sub-Delegation of the Power of Eminent**</u>
<u>**Domain to MVP under 15 U.S.C. § 717f(h) Unconstitutional**</u>

82.     The Plaintiffs hereby incorporate the facts and allegations contained in paragraphs 1-81 above.

83.     While Congress' delegation of the power of eminent domain under 15 U.S.C. § 717f(h) is overly broad and unconstitutional on its own as alleged in Count Two, FERC's sub-delegation to MVP pursuant to a Certificate is also constitutionally impermissible.

84.     It is well-established that delegated powers cannot lawfully be further delegated as explained by the maxim, "Delegata potestas non potest delegari." *See J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 405-06 (1928). Accordingly, FERC cannot lawfully delegate the power of eminent domain to MVP by issuing MVP a Certificate, or by any other means.

<u>**Count Four: MVP Has Already Violated the Virginia Plaintiffs'**</u>
<u>**Rights under the Fifth Amendment and Article I, §11 of the Virginia Constitution**</u>

85.     The Plaintiffs hereby incorporate the facts and allegations contained in paragraphs 1-84 above.

86.     MVP has repeatedly invoked Virginia Code § 56-49.01 to obtain a right of entry to engage in surveying activities on the Virginia Plaintiffs' properties.

87.     MVP's surveying activities, including the collection of tangible property (e.g., historical artifacts, soil samples, water samples, etc.) and intangible property (e.g., data and

information not available to anyone other than the landowner and the landowner's designees), constitute an unlawful taking under the Fifth Amendment to the United States Constitution as well as in violation of Article I, § 11 of the Virginia Constitution.

WHEREFORE, the Plaintiffs respectfully request that the Court enter judgment in their favor against the Defendants, and issue a preliminary and permanent injunction declaring the following, as well as any other relief as may be deemed just :

- FERC's Certification process is unconstitutional because it fails to asses public use or public purpose, and instead apples at least three different tests that each fail to satisfy the requirements of the Constitution;

- Any exercise or delegation of the power of eminent domain by FERC under 15 U.S.C. § 717f(h) is unconstitutional because Congress' delegation of the power of eminent domain is overly broad and lacks any intelligible principles;

- Any Certificate issued by FERC to MVP cannot constitutionally sub-delegate the power of eminent domain to MVP and MVP cannot exercise the power of eminent domain even if FERC grants MVP a Certificate; and

- MVP has violated the Virginia Plaintiffs' Fifth Amendment rights and their rights under Article I, § 11 by engaging in unlawful takings of private property.

Respectfully submitted this 27th day of July, 2017,

ORUS ASHBY BERKLEY, JAMES T. AND
KATHY E. CHANDLER, CONSTANTINE
THEODORE AND PATTI LEE CHLEPAS,
MARTIN AND DAWN E. CISEK, ROGER D.
AND REBECCA H. CRABTREE, ESTIAL
EARL ECHOLS, JR. AND EDITH FERN
ECHOLS,  GEORGE LEE JONES, ROBERT

32

WAYNE AND PATRICIA ANN MORGAN,
MARGARET MCGRAW SLAYTON LIVING
TRUST, AND THOMAS AND BONNIE B.
TRIPLETT

Justin M. Lugar (VSB No. 77007)
GENTRY LOCKE
900 SunTrust Plaza
P.O. Box 40013
Roanoke, Virginia  24022-0013
(540) 983-9300
Fax: (540) 983-9400
jlugar@gentrylocke.com

Counsel for Plaintiffs

By:_____
                        Of Counsel

20861/1/8091462v1

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing factual allegations are true and correct to the best of my knowledge, information and belief.

Kathy E. Chandler

_Kathy E. Chandler_
Plaintiff

_7/26/2017_
Date

20861/1/8060753v1